Good morning, Your Honor. I am Paul Eaglin of Syracuse, New York, here to represent Denise Cuffee. Thank you very much for hearing my client's appeal. This matter has to do with a social security disability claimant. Ms. Cuffee is an applicant for both a social security disability as well as supplemental security income. This arose, as you know, out of she was the innocent victim of a gunshot wound. Unfortunately, through and through, that damaged her peroneal nerve, which is the significant element of the argument that we bring forward before you today. The consequence of the damage to the peroneal nerve back in 2008 after surgery and so forth and some physical therapy is that much later on, after failing in her first attempt on a prior claim for social security disability, she brought a subsequent one, alleging that as of age 50 that she became disabled. The apparent reliance on the prior finding that she was, that her residual functional capacity was sedentary. At the time of the first ruling by ALJ Vest, that finding, residual functional capacity of sedentary, was not sufficient to result in a finding of disabled. That would have changed, however, by the time that she achieved the age of 50. And as we see in this case, this claim that was decided by ALJ Pianin, the ALJ decided, based on the evidence at the second hearing, that the judge determined that the residual functional capacity was light, greater than sedentary, which was then, again, not sufficient to find that Ms. Cuffee was disabled. We're relying here in this case, as we did in the district court, on the acquiescence ruling 0014. With respect to that AR, or acquiescence ruling, the argument that we're making is that the criteria, the three criteria of the AR were not satisfied here such that this court, or any court, should find that substantial evidence supported the finding of light residual functional capacity. In short, what we're saying is that because of the acquiescence ruling, the finding should have been that the residual functional capacity properly still was sedentary. We believe that is so because if you look at the three factors, the court should find that the residual functional capacity should still be based on the finding by ALJ Vest. The circumstances for deviation permitted by the AR were not there. That's our argument. So if we look first at the first criteria having to do with whether there's a change here, we put great emphasis on the finding of permanent nerve damage. There's a bit of an argument between the sides, as you notice from the briefing, about permanent. For treating Dr. Williamson in 2008 and then in 2009 during the follow-up, post-surgery, plus the physical therapy, used frequently the term permanent to describe the nerve damage. It's descriptive with respect to the nerve damage. Of course, the commissioner in her briefing also points out that there can be permanent, but there can also be a functional change. We don't dispute that. But even if you were to look at that, the element of the functional change, we believe that based on this record, especially if you look in light of the June decision, the Monroe decision that we gave the Rule 28J letter on earlier, if you look at the entire record and if you look for the bridge, the building of the bridge, the logical bridge between the evidence and the decision, we submit that a court, a reviewing court, should not be able to find that the agency satisfactorily put forth a decision that should withstand review. 2008 and 2009, she was injured in 2008 with a through-and-through as she was lying in bed. Innocent gunshot victim. So she had operations to repair her leg bones. And as we know from the record, the treating physician, the orthopedic physician, noted permanent nerve damage. He began to describe the characteristics of permanent peroneal nerve damage, including floppy foot, the diminution or absence of feeling in the outer toes, the outer two toes, and the loss of feeling or diminution of feeling on the surface of the left foot. And that's the one that figures prominently here, the left. There was a through-and-through on both legs, but the left figures prominently here. That's what we see in 2008-2009. The description of the injury, nerve injury, is permanent, as the treating physician said. If we go forward, she lost the first claim, disability claim. That resulted in a hearing in the Appeals Council denying review. That decision then became final. Later on, she started the second claim. So by the time of the period of late 2011 and 2012, what we see in the medical evidence is as follows. In December of 2011, she was seen by two treaters. Actually, one was not a treater. I should correct that. One was the agency's own physician, Dr. Grady, a consultative examination. The other one was Dr. Fowler and the physician assistant, Fusco, in Dr. Fowler's office. They rendered some of the findings, the physical findings that the agency relies on and the ALJ pioneer relied on in finding that there had been a substantial change for the improved residual functional capacity they came up with. We say that that is not sufficient evidence or that the court should not find that this is sufficient evidence. Here's why. Their own doctor, Dr. Grady, noted after the examination and the recommendations that she made in terms of Ms. Cuffee's physical functional capacities, noted also that Ms. Cuffee would need, may need a cane to ambulate after 100 feet. She also noted as apparently as Ms. Cuffee was leaving the site of the doctor's visit where she went to see Dr. Grady in compliance with the agency's directive. So Dr. Grady was apparently watching her as she left when the appointment was all over with. And apparently Ms. Cuffee was walking apparently normally initially, but after 20 feet she began to limp, favoring the left. So if we're talking about functional abilities, functional capacities, we see that the ALJ pioneer notes that at times, but does not take that into account in a functional sense. And even at one point, ALJ pioneer said there was not objective evidence to support that Ms. Cuffee's allegations with respect to the period of 2011-2012, and yet when he gives weight to Dr. Grady, he gives significant weight to Dr. Grady, and also characterizes her findings as objective medical evidence. If that's true, then two elements of the objective medical evidence are she would need a cane to ambulate after 100 feet, and something would need to be done, the agency would have to take into account the observation by Dr. Grady that Ms. Cuffee limps after 20 feet of walking. Those are significant findings. They're significant because they have to do with functional ability where the residual functional capacity is light. Light and sedentary both involve walking. Mr. Baird, really isn't this the AR00-14 governs the analysis here as well as this Court's prior opinion in the Albright case, correct? Yes, Judge Bennett, that's true. And where is it in AR00-14 that there is a presumption that the prior RFC be considered? It appears that, from my view of the Joint Appendix, there was clearly significant improvement in mobility, for example, was there not, in that there was no longer from a walker to a cane to no cane, there was significant improvement, was there not? There seemed to be significant improvement in terms of her ability, one, because the bones healed, number one. That's a significant reason why there would have been improvement, because the bones healed, but with respect to the peroneal nerve damage and the impact, as noted, Dr. Williamson, the treater, back in 2009, pointed out the loss at the exterior two toes and then the diminution of feeling on the undersurface of the left foot and noted for a while there, there was even use of cane and she worked off of that. But to get to your point, in the Monroe case, it's not so much the presumption as the Monroe case and the other authority. It can be considered, but there's no presumption that it's correct. Right, that's where I was going. Exactly, that's where I was going. The question is, it is to be considered as to be given weight, but then the question becomes, well, what weight? Which is why, I believe, why we're here, which is, was the weight given proper and did the agency articulate that decision well enough to you so that a review in court under Monroe could be satisfied that a logical bridge was made, was constructed analytically by the agency and explaining why now she's at light, but she was at sedentary a few years ago. I guess my question is that, again, my reading of this court's prior opinion in the Albright case, there's language in that case that talks about less confidence later in times, which suggests that a residual functional capacity analysis that's over two years old should not necessarily be given controlling weight, but that it will be considered, but it isn't to be given controlling weight, particularly in light of the passage of time and the improvement of the medical condition. Judge Bennett, I would agree with the way that you said it, but then I would say that the other aspect that Albright needs to consider is, yes, in most senses, many of the impairments that you probably encounter as judges are the types of impairments that would improve with time. But what our point is, is that because the nature of the impairment here is nerve damage, and nerves do not regenerate, then that needs to be considered, and the agency needs to explain that in a way to permit adequate judicial review. We believe that it is not done so here because there are contradictions here. Dr. Grady, speaking of the 100 feet, that a cane needed to ambulate after 100 feet, that she noticed a limp after only 20 feet of walking, and it's not as if Ms. Coffey was apparently faking it. She didn't notice that until she got away 20 feet away from her. So it's not as if Ms. Coffey was trying to put on a show for the doctor. May I reserve my three minutes? Thank you. Mr. Porter. Good morning, Your Honors. I begin with the AR, and I'll just refer to it as the AR. It's 0014. The AR does have, in essence, two commands. The first command is that a subsequent ALJ should consider the prior ALJ's finding, and then the second command is that the ALJ must give it, must give that prior RFC, or prior decision, appropriate weight based on the facts and circumstances of the case that is then before that judge. There is no preclusive effect to a prior decision of an ALJ. It is evidence in the subsequent case, and that's what happened here. Just to discuss the first command, the consider part of it, it is absolutely clear that ALJ Pannon considered the prior decision of ALJ Vest. He understood that the AR applied. He discussed the AR's provisions. He discussed the factors. He mentioned Albright and Lively, for that matter, and he discussed at length ALJ's Vest prior decision and findings, and he discussed at length the findings that he had since ALJ Vest's decision, why he believed that decision did not, excuse me, did not deserve significant weight in this case. Ms. Cuffey's take on the AR starts, let's start with the first factor. The first factor is whether the condition is subject to change. And Ms. Cuffey's position is simply that because Dr. Williamson said her nerve damage was permanent, that ends the discussion. We would suggest that that is not the case because the permanence of an impairment doesn't mean the functional limitations may not improve. They could get worse, too, but it does not mean that they don't improve. And so that first factor is just whether is something subject to change. The AR specifically speaks to that, specifically calling out residual functional capacities and says that is the type of finding that can change over time. And, of course, when we compare Lively, which was a two-week window, and Albright, which was a three-year window, you have that widespread. So what's our timing here? Well, we have a four-year gap between onset dates, between the first decision and the second decision. We have a three-year gap between the decisions themselves, July 2010 versus October of 2013. And we have greater than a two-year gap between the first decision, July 2010, and the onset date for purposes of the second decision. So you have not the Lively type of two-week gap or two-month gap. You have a substantial gap in time. And that, of course, was the problem in Lively is that the evidence overlapped entirely for the periods of adjudication. The second factor that plaintiff addresses, Ms. Cuffey addresses, is the likelihood that there would be change. And that argument actually just falls right back on the fact that it's permanent. And so the argument is, well, it's permanent, therefore it cannot change. But again, the permanence of an impairment does not necessarily speak to whether the functional limitations of the impairment have or have not changed. The last factor is the one I'd like to focus on, and that's the one where it speaks of whether there's some new evidence in the matter that may justify a change from the circumstances. And here there clearly is. The first one is the consultative exam by Dr. Grady. That is December of 2011. I would note that ALJ Pannon specifically discussed this examination in some detail. That's at page 17 of the appendix. I'd like to address some of the findings from that exam as they compare to prior findings from ALJ Vest's decision. One of the first findings is that there was no edema, no swelling, no edema of the legs. If you compare that back to May of 2009, there's a physical therapy note where Ms. Cuffee complained that her foot kept swelling on a regular basis. The examination noted no atrophy of the lower left leg and leg strength bilaterally at 5 of 5, meaning there was good strength in both extremities. There was even 4 of 5 strength in the left foot, which is the foot that has the most difficulties. Normal range of motion throughout both lower extremities. Again, as we compare, if we go back to September of 2009, the Sentara Department of Trauma, motor testing confirmed that there was quadricep weakness. She was referred for physical therapy for quadricep strengthening. And in November of 2009, she still was complaining of and there were still findings of quadricep weakness. So there is a significant change from the latter part of 2009 as you get into the end of 2011 where there is normal strength. The gait issue. There was a finding in December of 2011 that she had a normal gait, albeit with a slight limp on the left. In September of 2009... Normal gait with a slight limp. That's an oxymoron. Well, it is. But back... But when we go back before, if you tie that with also the assistive devices, we also know that throughout 2009 she was using assistive devices. She was referred for physical therapy for gait normalization. Even as late as June of 2010, the record, which was, again, the Sentara Department of Trauma referred to weight-bearing as tolerated, which at least suggests that there were some issues with weight-bearing on those feet. And, of course, her testimony before the ALJ, ALJ-Pannon, was that she could not recall when she last used a cane. And she did say definitively that she had not used a cane for roughly a year before that hearing. There was an issue as to medications. As of December of 2011, the report reflects that she is using over-the-counter medications, either Tylenol or Advil as needed for her pain. If we compare that to September of 2009, she has a prescription for Vicodin. And even in June of 2010, while she's taking over-the-counter, she's requesting something stronger. The next piece of evidence that we believe constitutes substantial evidence is the April 10, 2012, visit that she has with P.A. Bosk at Sentara Department of Trauma, the same location where Dr. Williamson is. Again, ALJ-Pannon specifically discussed that visit at page 17 of the appendix. Once again, we have a reference that she's not using a cane, as we've already discussed. She was using assistive devices throughout 2009. But significantly importantly there was a specific physical examination. The physical examination of the right lower extremity. As Mr. Eaglin notes, the gunshot wound injured both legs, and she had significant problems with both legs for a period of time. The lower leg extremity, there was some tenderness over where the screws were in the tibia,  Excuse me. In the right lower extremity there was no tenderness. There was full range of motion, strength, stability, and tone. That again compares differently from back in 2009. The left lower extremity, there was some tenderness over the location of the screws where the fractures were fixed, and some difficulty flexing toes. But again, the finding was normal strength, stability, and tone in the left leg. As I've already discussed, that contrasts with the quadricep weakness in 2009. And in 2010. I would add in addition that from the record we know that in 2009 that it was recommended that she undergo exercise to help improve her condition. As of this visit in 2012 with the Centenary Department of Trauma, she was not doing any exercise, yet she still had this full strength. There was a referral in 2012 for pain management. She didn't go. She was told to follow up as needed in this 2012 visit, and there's no indication that she followed up at all. And finally, then there is the Dr. Fowler's August 16, 2012 visit, which A.L.J. Pianin again discussed in the record at page 11 of the joint appendix, which found the 5-5 for lower extremity bilaterally for his muscular exam. Your Honors, we consider these three things to be adequate evidence to support the improved finding from sedentary to light work. And unless there are any further questions. Was there ever any update on Dr. Williamson's earlier report? As best as I can tell from the record, when Dr. Williamson saw the plaintiff in June of 2009, he did not see her again. She was seen by other people in his practice. I did not see any record to indicate any update. I did not. Three to four years old was not updated. Yes, that's correct. Any indication that the nerve damage is better? Well, that's actually, there was no further follow-up on the nerve damage, no further testing in the three years from, or three to four years from 2009 when Dr. Williamson made that comment into 2013. Comment? In the record, when he talked about the When he makes, when he says something as a comment, when your consultative physician sees it, it's gospel. I mean, I don't understand that. I mean, what it was a finding is undisputed in record that she has permanent nerve damage. And there's nothing that your doctors have found to dispute that. No, we don't, we don't dispute that she has permanent And those screws in her leg, when are they going to come out? Actually, they set her up to try to do that. And then they, it has never happened. They told her they would, they would remove the screws. It would help the pain, at least at that location. And what, what doctor said it would help remove That, that was, that was actually the next visit after the June 2009 visit with Dr. Williamson. I believe it was either June or September of 2009. I don't recall the provider, but it was with the Sentara Department of Trauma where Dr. Williamson is. And that would require yet another surgery. That would require surgery. That's correct. So, so basically, without any evidence that the nerve damage had improved, which, because you can't. Very rare that nerve damage is permanent. Damage is going to self-generate. So, she goes in for saying that she needs more help and she winds up not only not getting it, but getting less. By saying, you go from sedentary to light. Correct? Well, How many days was this consultation with a range of motion? Was it just one day? The, with Dr. With Dr. Grady? Yeah. That would have been a one day. One day. So then, all of the four years she's gone through, he's all of a sudden says she's improved because of these findings we call his and everything else is a comment. Well, I would, I would disagree somewhat that it's just Dr. Grady because she came back to the Sentara Department of Trauma in, in April of 2012 and was seen by P.A. Bosk who also did a physical exam who found that she had full strength in both legs. So, it, it wasn't just Dr. Grady, but it was also P.A. Bosk in the same, in the same shop. What kind of baseline did he or she set to determine it was full? That, that requires history to full range. What's full range for me means I mean that would be another. So, what in the record does it show how he, from a scientific standpoint, established a baseline for what is full for her? For the, for the, for the physician assistant. I'm not talking about R.O.M. Because her, her record, her record reflects her history. It is not an isolated, it is not an isolated visit. She's back there in follow up. So, it reflects her history. How much weight was she able to lift in terms of putting weight on that she was able to move up and down? Because that is how you determine leg strength. That is, that is not, that is not, that is not present in P.A. Bosk's medical record nor is it present in Dr. Williamson's record. Yeah, I didn't think so. I mean so, you make comments like it's full range but where, where is the scientific things you use, the metric that's used? I mean so often people's physicians say oh, full range. And everybody says oh, full range. How do you determine that? That's science. There's a metric for that. I didn't see, what was the weight? Was it five pounds? What? Was there a description of how they got to the full range? There was not a description of how the examination is done. Right, but in the final, she was full range because I saw her walk across the room or walk up down the stairs or there's none of that. There, there is not, there is not a description as far as I can recall in the records even back to 08 when they talk about range of motion. How did they actually do that? I see, so what, what was the diagnosis in 08 again? Well, in 08 she had the gunshot wounds that fractured both tibia and then there,  they determined that in the left foot that there was, there was this residual nerve damage that was permanent that was causing certainly some flexing and some, if I recall correctly, if I remember some tingling issues in the, in the foot area. That was from 08 and 09. And then in the follow up did she complain of those still? She did, she did complain of those and that's when there were the physical exams and, and through, during that time period as well there were suggestions look, we could do some surgery. She said she didn't want to. We could remove the screws and that never, that never occurred. There was, you know, you need to do home exercises and at least as of 12 she wasn't doing those. And then there was a referral for the PT for gait normalization and there's no indication that occurred. Connors, I see my time is up. Is there any further questions? Thank you very much. Thank you. Mr. Eaglin? Very briefly, Your Honor. First, with respect to the recommendation of the surgery regarding the screws, I would just like to point out that the record shows that Ms. Cuffee's response with respect to that is consistent with the agency's position. That is, in the sense that in order for that to be used effectively against her as a decision or to suggest somehow that she's not doing all that she can, there has to be some level of confidence that it would make things better. As you note from the record, she was not confident that it would make things better, nor could they assure her it would. The assurance with respect to that is, if we take the screws out, this might make things better. They can't be sure. She was concerned about the level of that guarantee and so she opted not to go undergo that surgery. With respect to the period of Dr. Grady's consultative examination, we asked that the court keep in mind that even as the agency took into account in the RFC what she said in terms of capacity, ability, on the part of Ms. Coffey, the agency did not take effective account of Dr. Grady's mention that after 100 feet, in her opinion, in Dr. Grady's opinion, that Ms. Coffey was limping after 20 feet. So I make that point again because too often with respect to consultative examinations or other patient encounters with doctors in these disability claims, there is the mention of the person magnifying the symptoms and so forth. There is no indication that Ms. Coffey was doing that with Dr. Grady.  Grady was noting that after the exam was over, Ms. Coffey was leaving after 20 feet, she noted a limp to the left. It's as if Ms. Coffey was trying to do the best that she could. I thought it was interesting that she had no edema. Edema is just swelling. You go to work in the morning and come back in the afternoon and your ankles could look like balloons. It was no swelling. Yes, I would agree with that. Shortly after her status post-surgery 2008-2009, of course, when you're four years on from that, the bones have healed and the swelling would go down. The fact that there is or is not swelling does not necessarily say anything about nerve damage. There is no indication that the nerve damage repaired to such an extent as to solve the problem of the impact to her left leg for that through and through and the peroneal nerve damage to that left leg. I see my time is out. Are there any other questions, Your Honor? Thank you. Thank you very much. We are going to come down to the Counsel and proceed to our last case.
judges: Roger L. Gregory, Diana Gribbon Motz, Richard D. Bennett